LOUVILLE F. NILES & another, trustees, & another *vs.*
BOSTON RENT CONTROL ADMINISTRATOR & others
(and a companion case[1]).

Suffolk.    September 15, 1977. — March 23, 1978.

Present: HALE, C.J., ARMSTRONG, & BROWN, JJ.

*Rent Control. Boston. Municipal Corporations,* Rent control. *Jurisdic-
tion,* Rent control. *Administrative Officer. Practice, Civil,* Appeal.
*Words,* "Fair net operating income."

Discussion of the standard of judicial review applicable to rent control
determinations. [140-141]
Neither St. 1970, c. 842, nor the Federal or State Constitution requires
that rents be determined on the basis of a reasonable return on the
fair market value of the property; the correct standard is "fair net
operating income" or "fair return on investment." [141-146]
In a proceeding for review of a decision of the Boston rent control
administrator an owner failed to establish that a rent adjustment
did not provide a fair net operating income. [146-147]
A rent adjustment by the Boston rent control administrator made on
the basis of a reasonable return on the fair market value of the
property in question was invalid for failure of the administrator to
comply with a regulation adopted by him under the authority of
St. 1970, c. 872, § 5; the return on value standard could not be
upheld as an interpretive gloss on the administrative regulation
where the interpretation had been adopted merely as the adminis-
trative response to a lower court decision later held to be invalid.
[148-150]
In a rent adjustment proceeding by the Boston rent control adminis-
trator, the administrator's decision to waive one of his own procedu-
ral regulations by dispensing with the requirement of certain finan-
cial information from the property owner was not subject to judicial
review, where the tenants were not deprived thereby of any due
process or other rights. [150]

---

[1] The companion case is Benjamin Cohen & others *vs.* Louville F.
Niles & another, trustees, & another.

Where the governing statute set no period within which appeals from
decisions of the Boston rent control administrator must be filed the
administrator was without authority to fix such a period by regula-
tion, and the time allowed is a "reasonable time ... determined
from the facts and circumstances" of each case; a petition for review
filed by tenants twenty-nine days after notice of the administrator's
decision was timely. [151]

In a proceeding for review of a decision by the Boston rent control
administrator, questions fully litigated in the Housing Court with-
out objection by the owners were properly before this court on
appeal, notwithstanding the tenants' failure to raise them at the
hearing before the administrator. [151-152]

TWO CIVIL ACTIONS commenced in the Housing Court of
the City of Boston on October 1, 1975, and December 4,
1975, respectively.

The cases were heard by *Daher*, J.

*Mark L. Snyder* for Boston Rent Control Administra-
tor.

*Saul A. Shapiro* for Benjamin Cohen & others.

*Mitchel S. Ross* (*Kenneth S. May* with him) for Louville
F. Niles & another, trustees, & another.

BROWN, J. These cases arise out of two rent adjust-
ments ordered by the Boston rent control administrator
(administrator) in August, 1975, and November, 1975,
respectively, for Westbrook Village, an apartment com-
plex.

The August, 1975, adjustment increased the rents at
Westbrook Village to a gross maximum level of $946,236
annually. The tenants appealed from that decision to the
Housing Court of the City of Boston, arguing that the
administrator had not followed his own regulations. A
judge of the Housing Court upheld that adjustment, and
the trustees (owner) and the tenants now appeal from the
judgment.

In November, 1975, the administrator ordered the
gross maximum annual rent for Westbrook Village re-
duced to $796,392, following his receipt of information
(1) that the real estate taxes on a vacant adjacent parcel
of land had been included in the operating expenses of the

apartment complex which the administrator had considered in arriving at his August adjustment, and (2) that the owner had received substantial real estate tax abatements. The owner appealed to the Housing Court, the gravamen of its complaint being that the November adjustment did not permit it a fair return on the fair market value of its property and that such a return is required by St. 1970, c. 842, and the Constitutions of both the Commonwealth and the United States. The Housing Court judge found the administrator's decision to be null and void. The administrator and the tenants appealed from that judgment. The owner filed a cross appeal.

As the appeals raise questions concerning the methods used by the administrator to adjust rents, we shall first describe the procedures followed by the administrator in setting rents. We shall then discuss the two appeals separately, dealing first with the November adjustment and then with the August adjustment.

The rent control statute, St. 1970, c. 842, § 6, rolled rents for controlled units[2] back to the rents charged six months prior to the acceptance of the act by the municipality, except where rents had been adjusted under prior rent control acts.[3] It further provided that the administrator or board should make such adjustments of those rents as might be necessary to assure that rents would be set at levels which would yield a "fair net operating income" to owners. Chapter 842, § 7(b), set out various factors which were to be considered, among others, in determining whether a rent level would provide a "fair net operating income."

---

[2] It is not contested that these units are controlled.

[3] Prior to its adoption of c. 842, the City of Boston, acting under special enabling legislation, St. 1969, c. 797, as amended by St. 1970, c. 863, had established a system of rent control, under c. 10 of the Ordinances of the City of Boston (1969) and c. 11 of the Ordinances of the City of Boston (1970).

Boston rent control administration Regulation 6, adopted by the administrator pursuant to authority under c. 842, § 5, sets out the procedure to be used in adjusting rents. Regulation 6 provides essentially a cost pass-through method for determining rents. Section 5 of Regulation 6 sets out the specific presumption that rents charged for December, 1971, yielded a fair net operating income. This presumption may be overcome by evidence tending to show that the rents charged for December, 1971, yielded more or less than a fair net operating income. Section 4 of Regulation 6 sets out various factors which are then to be considered in adjusting rents. These factors parallel those set out in c. 842, § 7(b).

In addition to the calculation under Regulation 6, the administrator began the practice, following a decision by the Housing Court of the City of Boston requiring a fair return on fair market value,[4] of also performing an analysis based on that standard as a check on the other calculation, on the theory that a fair return on fair market value is required by c. 842's requirement of a fair net operating income.[5] The practice of using such a criterion has not been incorporated into any regulation.

In the August, 1975, rent adjustment the administrator first calculated the rent level under Regulation 6, which yielded a gross maximum annual rent level of $876,191. The presumption that the December, 1971, rents yielded a fair net operating income was not questioned by the

---

[4] M.E. Goldberg Trust *v.* Boston Rent Control Admn., Housing Court of the City of Boston, Eq. 00580 (1974).

[5] According to the administrator, a number of different methods are used in determining fair market value. The parties, however, stipulated to the inclusion in the record of a statement by a hearing officer that the administrator determines fair market value by multiplying the assessed value by three. The administrator states in his brief that a number of different methods are used by him to determine fair market value, including (1) multiplying the assessed value by three, and (2) use of a recent purchase price. In any event, whether the first method or several methods are used is not determinative of the outcome of this case.

owner or by the tenants. Under the policy described above, the administrator did a second calculation in which the gross rents were multiplied by a factor of 5.5 to determine a fair market value; a return of 7.5% on that value was then determined. This computation yielded an annual rent level of $946,236. This amount, which was higher than that determined under Regulation 6, was approved as the maximum annual rent level for Westbrook Village.

The tenants argue that (1) this adjustment was invalid because it was in violation of Regulation 6; (2) the decision was not supported by substantial evidence; and (3) the administrator should have rejected Westbrook Village's initial application for a rent increase because the application did not contain all the information required by Boston rent control administration Regulation 3.

The reduction in the maximum rent level ordered in November, 1975, was made under the Regulation 6 cost pass-through method, by deducting the now disallowed amounts which had previously been allowed as expenses. In this adjustment also, the presumption that the rent level in December, 1971, yielded a fair net operating income was not rebutted. In addition to the Regulation 6 calculation, the administrator also did a return on value analysis, using three times the assessed value of the property as the fair market value. Because this calculation yielded a lower amount than the Regulation 6 method, the amount yielded by the latter was approved as the maximum gross rent level.

Contending that it was entitled to a fair return on the fair market value of the property and that this adjustment did not permit such, the owner, who had introduced expert testimony as to the fair market value of the property and a fair rate of return, appealed from the administrator's decision to the Housing Court. The Housing Court ruled (1) that Regulation 6 was valid on its face and not confiscatory and (2) that confiscation had not been proved. However, following M.E. Goldberg Trust *v.* Bos-

ton Rent Control Admn. (*supra* note 4) and relying on the decision in *Zussman* v. *Rent Control Bd. of Brookline*, 4 Mass. App. Ct. 135 (1976), *S.C.* 371 Mass. 632 (1976), the judge found that, in light of the expert testimony, "the [r]ent [c]ontrol [a]dministration [r]ecord [was] inadequate" to support the decision, and remanded the case for additional evidence and findings on the question of fair market value and a fair rate of return. After the administrator made such findings, but did not hold a new hearing, the Housing Court judge declared the rent adjustment null and void, leaving the rents at the previous (higher) level. It is this judgment from which the administrator and the tenants now appeal.

## I. *November, 1975 Rent Adjustment.*

### A. Standard of Review.

In reviewing rent control determinations, the proper role of the court "is not to take evidence afresh and decide for itself what rent is to be fixed, but is rather to decide whether the [administrator's] decision was supported by the facts before [him] and was legally justified." *Sherman* v. *Rent Control Bd. of Brookline*, 367 Mass. 1, 10 (1975). "[J]udicial review of facts in rent control cases does not extend to the taking of evidence de novo." *Zussman* v. *Rent Control Bd. of Brookline*, 371 Mass. 632, 637 (1976).

We are also guided by the principle suggested by Justice Wilkins in his concurring opinion in the *Zussman* case with regard to the proper handling of successive appeals of a rent control decision where confiscation is alleged. Justice Wilkins points out that in dealing with facts and findings in an agency record, each court should be entitled to its own judgment, since "[e]ach court is conducting an analysis of the same agency record, and there is no reason why the first court's view should be given any special weight .... It would be peculiar if appellate courts were compelled to give greater weight to the independent views of the trial judge than the trial judge himself had to extend to the agency presumed to be

the qualified expert on the subject in issue." *Id.* at 641–642.

The owner argues that this court should limit its review of the decision below to a consideration of whether the Housing Court judge applied the correct standard in his review of the administrator's decision and further argues that, for that reason, the Housing Court's decision that the November determination was not supported by substantial evidence should stand. It cites in support of this position a line of Federal cases and also the comment by the Supreme Judicial Court in *Zussman* v. *Rent Control Bd. of Brookline,* 371 Mass. at 639, that it was "not inclined to dispute" the finding of the trial judge that the figure used by the board for the value of the property "falls within the range of what may be regarded as reasonable under the circumstances."

However, we conclude that although the Housing Court judge followed the proper standard of review of the facts, he did not apply the correct legal standard. With regard to the form of review of lower court decisions in cases such as this, we believe that the owner is reading the Supreme Judicial Court's comment more broadly than intended, because in the same case that court also overturned the finding by a Superior Court judge that the rent board's decision was confiscatory. Further, with regard to the standard of review enunciated in Federal cases, Professor Davis points out that although the United States Supreme Court has enunciated the doctrine that the question of substantial evidence to support an agency's finding is to be decided by a Court of Appeals, not the Supreme Court, in fact "the Supreme Court does not hesitate to substitute its judgment for that of a lower court on the question whether administrative findings should be set aside." Davis, Administrative Law of the Seventies § 29.04 (1976).

B. "Fair Net Operating Income."

The owner's contention, and the Housing Court judge's finding, that the administrator's November rent adjust-

ment was null and void turn on the assumption that St. 1970, c. 842, and perhaps the Federal and State Constitutions, require that owners be permitted a reasonable return on the fair market value of their property. However, neither St. 1970, c. 842, nor either Constitution requires that rents be determined in that way.

Statute 1970, c. 842, § 7, requires that rents be established at levels which yield to landlords a "fair net operating income." The Supreme Judicial Court in *Marshal House, Inc.* v. *Rent Control Bd. of Brookline*, 358 Mass. 686 (1971), upheld c. 842 as constitutional and interpreted the term "fair net operating income" to require that rents be set "so as to assure to landlords a reasonable return on their investment." *Id.* at 703. The court left open the question whether the rents set in particular instances might be confiscatory. *Id.* at 706. The burden of proving confiscation in such instances is on the owner. *Zussman*, 371 Mass. at 638. See the *Marshal House* case, 358 Mass. at 706.

On the basis of the *Marshal House* decision, the owner would have us hold that, to ensure a fair net operating income under c. 842, rents must be set so as to assure a reasonable return on the fair market value of the property. However, the Supreme Judicial Court has never held that a fair return on fair market value is required. With the exception of *Answer of the Justices*, 356 Mass. 769, 773 (1969),[6] in which the Justices referred to the lack of a provision for "a fair return on the value of the property" in a proposed rent control bill, the Supreme Judicial Court has in every instance used fair return on investment as the standard required for "fair net operating income." *Marshal House, Inc.* v. *Rent Control Bd. of Brookline*, 358 Mass. at 703, 705, 706.

---

[6] This was not a holding that such a standard was required. The comment was made in a reply to the House of Representatives in which the Justices declined to give an opinion on the constitutionality of other facets of a proposed bill. Moreover, the court pointed out in *Marshal House, Inc.* v. *Rent Control Bd. of Brookline*, 358 Mass. at 703, that that comment was merely a suggestion for a statutory standard.

In holding that a fair return on fair market value was required, the Housing Court judge may have been misled by the language of this court in *Zussman* v. *Rent Control Bd. of Brookline*, 4 Mass. App. Ct. at 141, 142–143, referring to a reasonable return on the fair value of the property. However, the question whether rents are required to be based on fair market value was not at issue. On appeal, the Supreme Judicial Court did not follow the decision of this court that a trial de novo on issues of both fact and law is required where confiscation is alleged, but held that where investment exceeded fair market value, rents based on fair market value were not confiscatory. The court reiterated its reading of the term " 'fair net operating income,' as it appears in St. 1970, cc. 842 and 843, 'to require that rents be set so as to assure to landlords a reasonable return on their investment.' That remains the governing standard in this Commonwealth today." *Zussman*, 371 Mass. at 637–638.

Federal case law does not establish that a fair return on the fair market value of property is required by the United States Constitution. To the contrary, the United States Emergency Court of Appeals held in *Wilson* v. *Brown*, 137 F.2d 348, 354 (1943), that the Emergency Price Control Act, 56 Stat. 23 (1942), which authorized the administrator to prescribe maximum rents which were in general fair and equitable but which in individual cases might prevent a landlord from earning a fair return on the fair market value of the property, was constitutional. Noting that before enacting the statute the House of Representatives had considered and defeated an amendment which would have required a fair return on the value of property, the court upheld the act, ruling that the decision by Congress not to require adjustments to assure a fair return on value was a rational one because of the difficulties of determining the value of property. 137 F.2d at 351–352.

Where rents are based on the fair market value of property which in turn is determined by the rents re-

ceived on the property, the process is circular. Moreover, whether fair market value is based on rents or on comparable sales, use of this figure as a basis for setting rents can result in incorporating inflationary factors into the rental formula.[7]

The Supreme Court of New Jersey in *Troy Hills Village* v. *Township Council of Parsippany-Troy Hills*, 68 N.J. 604 (1975), also pointed out the difficulties in using fair market value as a basis for setting rents: "Rent control begins with the premise that rents are being unfairly inflated as a result of failure in the free operation of the rental housing market. . . . A standard of valuation which itself incorporates this failure will quickly defeat the purpose of rent control. Thus, valuation based on inflated rents would inevitably and erroneously lead the courts to a conclusion that a regulation which fails to permit such inflated rents is confiscatory." 68 N.J. at 623. Although the owner cites this case for the proposition that the value of the property must be determined in setting rents in that State, the New Jersey Supreme Court defined value in this context not as fair market value or exchange value[8] but as "the

[7] Referring to this problem, the court in *Wilson* v. *Brown, supra,* stated, quoting the administrator, "The use of market value as a test is inconsistent with the regulation of rents, because the value of the property on the market depends in large measure upon its earnings and inflated rents result in inflated market values . . . ." 137 F.2d at 353.

[8] The court called attention (68 N.J. at 624) to the fact that Mr. Justice Brandeis's position in *Missouri ex rel. Southwestern Bell Tel. Co.* v. *Missouri Pub. Serv. Commn.*, 262 U.S. 276, 289–311 (1923) (Brandeis, J., concurring), that "rate-making" value and "exchange" value serve different functions and need not coincide, became the law of the land in *FPC* v. *Hope Natural Gas Co.*, 320 U.S. 591 (1944). In his *Missouri* opinion Mr. Justice Brandeis pointed out that the "thing devoted by the investor to the public use is not specific property, tangible and intangible, but capital embarked in the enterprise" and that therefore the utility should be permitted a fair return on the amount "prudently invested in" it, not on the exchange value or a value which is ascertained by giving weight to estimates of what it would cost to reproduce the property. 262 U.S. at 290–291, 310.

worth of the property in the context of a hypothetical
market in which the supply of available rental housing is
just adequate to meet the needs of the various categories
of persons actively desiring to rent apartments in the
municipality." *Id.* at 623–624.[9]

In § 1 of St. 1970, c. 842, the Legislature found that
"housing demolition, deterioration of a substantial por-
tion of the existing housing stock, insufficient new hous-
ing construction, increased costs of construction and fi-
nance, inflation and the effects of the Vietnam war" had
"resulted in a substantial and increasing shortage of
rental housing accomodations for families of low and
moderate income and abnormally high rents." Thus, to
require incorporation into the rental formula of a fair
market value inflated as a result of such causes would be
to require that the very elements the statute sought to
remove or lessen be reintroduced as factors in the rent
determining process.

The difficulties which have been referred to are evident
in this case. The expert witness who testified on behalf of
the owner used two methods to determine value — a
gross rent multiplier method and comparable sales, both
of which inject into the "value" (and thus into the rents)
the inflationary factors which rent control seeks to elimi-
nate. We note that the Supreme Judicial Court also ap-
pears to have recognized the difficulties inherent in re-
quiring rents to be based on fair market value by its
approval of the findings and rulings of a District Court
judge in *Rent Control Bd. of Cambridge* v. *Gifford,* 362
Mass. 870, 871 (1972).[10]

---

[9] The court noted that "[t]his technique of hypothesizing a rental
market with comparable levels of supply and demand has been uti-
lized in English rent control legislation for several years." 68 N.J. at
624.

[10] The District Court judge had stated: "It seems clear from the
wording of Chapter 842 and from the ruling of the court in the Mar-
shal House case that what is to be considered is a fair return on the
landlord's investment. It is not a fair return on the market value of

In sum, neither the Supreme Judicial Court nor the United States Supreme Court has held that regulated rents must provide a fair return on the fair market value of property. The standard under St. 1970, c. 842, is a "fair net operating income," or a "fair return on ... investment," *Marshal House*, 358 Mass. at 706. This standard has "some similarity ... [to] the standard for insurance premiums of 'adequate, just [and] reasonable,' which we read in *Massachusetts Bonding & Ins. Co.* v. *Commissioner of Ins.*, 329 Mass. 265, 270 [1952] to require premiums which were more than barely confiscatory." 358 Mass. at 704.

A rate which makes it impossible for an efficient operator to stay in business or derive any profit whatever for shareholders is confiscatory. *Covington & Lexington Turnpike Rd. Co.* v. *Sanford*, 164 U.S. 578, 592 (1896). In *Aetna Cas. & Sur. Co.* v. *Commissioner of Ins.*, 358 Mass. 272, 281 (1970), the Supreme Judicial Court held that "[w]hile [the Commonwealth] is not constitutionally required to fix rates which will guarantee a profit to all insurers, it may not constitutionally fix rates which are

---

the property. If the fair return is to be based on market value, other elements than the landlord's investment are involved, such as the increased value which has arisen because of a substantial and increasing shortage of rental housing accomodations which result in the landlord receiving more than a fair return on his investment. It results in his getting the benefit of the emergency conditions which Section 1 of Chapter 842 gives as the reason for the enactment of the act. The landlord's investment may well be and probably is much less than what the market value [is]. The result of the action of the Administrator has been to ensure to the landlords rents which exceed fair net operating income. The fair net operating income is not dependent upon market value, but would appear to be based upon operating expenses, in relation to the landlord's investment which is not market value." Ackerman *vs.* Corkery, Third Dist. Court of E. Middlesex, Eq. 17 (1971). The Supreme Judicial Court in a short rescript opinion relying on the *Marshal House, Inc.* v. *Rent Control Bd. of Brookline*, 358 Mass. 686, 702–703, definition of the term "fair net operating income" upheld the findings and rulings of the District Court judge as being "in accordance with both the cited statutes and that decision." 362 Mass. at 871.

so low that if the insurers engage in business they may do so only at a loss."

The owner has not shown that the rents as adjusted in the November, 1975, decision are confiscatory or do not yield a fair net operating income or a fair return on investment. The Housing Court judge found and ruled that the rent adjustment was not confiscatory. We have no basis for overturning that determination.

The Housing Court judge held that Regulation 6 is constitutional. We agree with that holding. Regulation 6, § 4, which parallels § 7 of c. 842, sets out various factors to be taken into consideration in adjusting rents to assure a fair net operating income. Further, Regulation 6 provides a mechanism for overcoming the presumption that December, 1971, rents produced a fair net operating income. In addition, it provides that an adjustment to rents may be made in the event of extreme hardship to the landlord. The owner did not challenge the presumption in Regulation 6 that it received a fair net operating income in December, 1971, nor did it attempt to show that subsequent changes made such a return unfair or that that level of net income would produce a hardship.[11] In short, the owner has not shown that the November, 1975, rent adjustment did not provide a fair net operating income.

We, therefore, conclude that the administrator's decision was legally justified and supported by the evidence.

The owner's argument that the administrator was required by prior practice to use a return on value standard is not persuasive because (1) the administrator did not have a practice of doing a return on value analysis in the form desired by the owner and (2) even if the administra-

---

[11] Justice Wilkins comments in his concurring opinion in *Zussman* v. *Rent Control Bd. of Brookline*, 371 Mass. at 643, upholding the rent set by the rent control board, that the rate of return permitted "was apparently the return allowed when rent control came into effect and was valid presumptively . . . . The landlord has neither proved that the initial return was inappropriate nor that changes have occurred which require an adjustment in that 6.8% return."

tor were bound by his prior practice, he performed a return on value analysis in this case in accord with his prior practice—multiplying the assessed valuation by three to determine market value—which yielded a lower rent level than Regulation 6.

As we hold that a fair return on fair market value is not required and that the November, 1975, adjustment was legally justified and supported by the evidence, it is unnecessary to reach the question whether the Housing Court judge erred in refusing to remand the case for further hearing or in failing to make the order retroactive.

II. *August, 1975, Rent Adjustment.*

We return now to the August, 1975, rent adjustment. In making this determination the administrator first did a computation under Regulation 6, which yielded a maximum gross annual income of $876,191. The administrator then did a return on value analysis, using a multiplier of 5.5 times the 1974 rents, to determine value. The second method yielded a higher gross maximum income, $946,-236, which was approved as the maximum gross rent level.

The tenants argue that this adjustment is invalid because (1) the administrator did not comply with his own Regulations 3 and 6 and (2) the decision was not supported by substantial evidence.

1. First, with regard to Regulation 6, the tenants argue that the administrator's use of a return on value standard was in conflict with that regulation. Regulation 6 was adopted by the administrator pursuant to his authority under St. 1970, c. 842, § 5. There is no provision in the regulation for a return on value standard.

The administrator argues that use of the return on value analysis is a necessary supplement to, and an interpretation of, Regulation 6, § 4(i), which provides that the administrator may "[a]dd or subtract, respectively, such further amounts as may be necessary to avoid gross inequity and extreme hardship to the landlord or the

tenants and to assure that rents ... are established at levels which yield a fair net operating income ...." The administrator argues that confiscatory rents cause gross inequity and extreme hardship to the landlord. He contends that the return on value analysis is therefore an interpretation of Regulation 6 and as such does not require a formal amendment to be incorporated into the regulations. He argues further that the return on value standard is necessary to prevent the rent levels from being unconstitutionally confiscatory.

While a legislative rule (i.e., a regulation promulgated by an agency under legislative power validly delegated to it) is "as binding upon a court as a statute if it is (a) within the granted power, (b) issued pursuant to proper procedure, and (c) reasonable" (1 Davis, Administrative Law § 5.03, at 299 [1958]), an interpretive rule is not binding on the courts. *Id.* § 5.03, at 302, § 5.04, at 307. *Skidmore* v. *Swift & Co.*, 323 U.S. 134, 140 (1944). Where an interpretive rule is in question "the inquiry is not into validity but is into correctness or propriety." *Davis, supra,* § 5.05, at 315.

The administrator did not place this gloss on Regulation 6 from the inception of the regulation; this interpretation was adopted only after the Housing Court decision in M.E. Goldberg Trust *vs.* Boston Rent Control Admn. (see note 4, *supra*). Where an administrative agency changes its interpretation of a statute or regulation based on a court decision which is later held to be incorrect, its interpretation is not considered as having persuasive force. *White* v. *Winchester Club*, 315 U.S. 32, 39–40 (1942).

As we conclude that the administrator is not required by either c. 842 or the Federal or State Constitutions to assure a fair return on fair market value, the administrator's interpretation that such a standard is a necessary gloss on Regulation 6 is incorrect.

Thus, as the return on value standard was not necessary to ensure a fair net operating income, and as no finding of extreme hardship was made, the adjustment

does not fall within § 4(i) of Regulation 6. As stated above, the administrator has adopted no other regulation incorporating this procedure.

Rules which have been promulgated pursuant to a legislative grant of power have the force of law and are binding on the agency which issued them. *DaLomba's Case,* 352 Mass. 598, 603 (1967). See also Schwartz, Administrative Law § 59 (1976). Therefore, the administrator was required to follow Regulation 6, the regulation adopted by the administrator pursuant to his authority under St. 1970, c. 842, § 5. As the rent adjustment of August, 1975, did not comply with Regulation 6, it was invalid.

2. As we hold that the August, 1975, adjustment did not comply with Regulation 6, we do not reach the question whether it was supported by substantial evidence.

3. The tenants also argue that the administrator was required by his own Regulation 3, § 3, to dismiss the application for a rent increase as incomplete because the owner had failed to include on the property financial statement the amount paid for the property. The administrator argues that this rule is a procedural rule whose "purpose is to provide necessary information for proper processing and decision-making by the agency" and to "facilitate the orderly transaction of agency business." He points out that a petition which cannot be read or understood will be dismissed without prejudice, while a petition which is incomplete will "only be dismissed if it is lacking the information needed for proper processing and decision-making." He points out that there was no harm to the tenants from the omission here in issue, because the information called for by that question is not required for the Regulation 6 computation. Since the rule was a procedural rule and the tenants were not deprived of any due process or other rights, the administrator's waiver of this requirement is not reviewable. See *American Farm Lines* v. *Black Ball Freight Serv.,* 397 U.S. 532, 539 (1970).

4. On its cross appeal, the owner argues that the appeal of the tenants from the decision of the administrator should be dismissed because it was commenced after the expiration of the period permitted for appeal by Boston rent control administration Regulation 3, § 10, which provides that the notice of the administrator "shall state that the decision may be appealed by filing a petition . . . within seven days after notice of the decision." However, St. 1970, c. 842, § 10, sets no period within which appeals to the court must be filed, and the administrator had no authority under c. 842 to issue a regulation affecting the jurisdiction of the courts or limiting the statutory right to judicial review under c. 842, § 10.Therefore, insofar as Regulation 3, § 10, sets a seven-day time limit for appeals, that regulation cannot be given effect. In the absence of a time period specified by statute, the time allowed for filing appeals is a "reasonable time," which "is to be determined from the facts and circumstances of each particular case." *Commissioner of Corps. & Taxation* v. *Malden*, 321 Mass. 46, 51–52 (1947). The tenants' petition was filed twenty-nine days after receipt of the notice of the administrator's decision. The Housing Court allowed the filing of the appeal, following its stated practice that, depending upon the facts and circumstances of each case, it would allow up to thirty days for appeals from decisions of a rent control board or administrator. The owner has made no argument that the thirty-day period permitted by the Housing Court was unreasonable in this case. Moreover, the cases cited by the owner all involved time limits prescribed by statute and are inapposite to the issues arising here.

5. The owner also argues that the tenants should not be permitted to raise on appeal the questions of failure to comply with Regulation 3 and with Regulation 6 because these questions were not raised at the hearing before the administrator. See *Russo's Case*, 1 Mass. App. Ct. 206, 207–208 (1973). See also *United States* v. *L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 36–37 (1952). However,

both of these questions were litigated in the Housing Court without, so far as appears, any objection by the owner. Thus, this argument cannot be considered on appeal. See *Milton* v. *Civil Serv. Commn.*, 365 Mass. 368, 379 (1974); *John B. Deary, Inc.* v. *Crane*, 4 Mass. App. Ct. 719, 724 (1976).

The judgment of the Housing Court with regard to the November, 1975, rent adjustment is reversed, and a new judgment is to be entered affirming the decision of the administrator. With regard to the August, 1975, rent adjustment, the judgment is reversed and the case is to be remanded to the administrator for a redetermination of that adjustment in accordance with Regulation 6.

*So ordered.*